OPINION
This is an accelerated calendar appeal. Appellants, James and Judith Furness, appeal from a final judgment of the Portage County Court of Common Pleas granting appellee, Dr. Allen Pois, summary judgment. For the reasons that follow, we affirm the judgment of the trial court.
Appellants filed the instant medical malpractice action against appellee on November 12, 1993.[1] In their complaint, appellants alleged that appellee had negligently injured the brachial plexus nerve in Mr. Furness' right shoulder while performing an arterial bypass operation on August 9, 1990. They further alleged that as a result of this injury, Mr. Furness suffered permanent damage to his right arm including numbness, extreme pain, and a constant tremor. Mrs. Furness joined in the complaint for loss of consortium
On June 20, 1994, appellee filed a motion with the trial court to strike appellants' complaint. Appellants did not file a brief in opposition. The trial court, sua sponte, converted appellee's motion to strike into a motion for summary judgment. The court then proceeded to grant the motion on July 26, 1994.
On appeal, this court reversed the judgment of the trial court.Furness v. Pois (1995), 107 Ohio App.3d 719. In doing so, we concluded that even though appellants did not timely respond to appellee's motion to strike, the trial court erred by not giving them appropriate notice of its intention to convert the motion. We ordered the trial court on remand to either rule on the motion to strike, or in the alternative, give the parties appropriate notice of its intention to convert appellee's motion into a summary judgment exercise.
As a result of our ruling, the trial court conducted a status conference and granted appellants until April 1, 1996 to respond to appellee's motion to strike. During the interim, the parties engaged in considerable discovery. In a judgment entry dated May 3, 1996, the trial court denied the motion to strike.
Although the record is not clear, the case apparently proceeded to trial sometime in November 1997. Nevertheless, it is apparent from the argument of the parties that the trial court declared a mistrial and rescheduled the matter for a new trial.
On July 13, 1998, appellee filed several motions in limine with the trial court to exclude the testimony of Dr. Robert Gilliland ("Dr. Gilliland") from the upcoming retrial. In particular, appellee asked the court to bar Dr. Gilliland from testifying about the appropriate standard of care in similar cases, and as to the cause of Mr. Furness' tremor. The trial court conducted a hearing on July 21, 1998 where both parties were represented by counsel throughout the proceedings. Appellants filed a brief in opposition on August 3, 1998. On September 16, 1998, the court granted appellee's motions in limine.
Shortly after the trial court's ruling, appellee filed a motion for leave to file a motion for summary judgment instanter on October 21, 1998. On October 27, 1998, the court granted appellee's motion for leave. The next day, appellants filed a brief in opposition to appellee's motion for leave. Appellants, however, never filed a brief in opposition to appellee's motion for summary judgment.
On January 27, 1999, the trial court granted appellee's motion for summary judgment, finding that there was no genuine issue as to any material fact in relation to appellants' claim of medical malpractice. From this judgment entry, appellants filed a timely notice of appeal with this court. They now assert the following assignments of error for our consideration:
 "[1.] The lower court erred in granting Defendant's Motion for Summary Judgment as there still exists a genuine issue of material fact.
 "[2.] The lower court erred in granting Defendant's Motion in Limine excluding the expert testimony of Dr. Gilliland."
For ease of discussion, we will address appellants' second assignment of error first. In their second assigned error, appellants argue that the trial court abused its discretion in granting appellee's motion inlimine.[2] Appellants maintain that Dr. Gilliland should have been permitted to testify about the cause of the tremor in Mr. Furness' right arm because his testimony is both relevant and reliable, and would assist the trier of fact in reaching a decision as to whether or not appellee had damaged Mr. Furness' brachial plexus nerve during the arterial bypass operation. Moreover, appellants claim that simply because Dr. Gilliland's theory of peripheral nerve damage has just begun to be recognized in scientific literature does not mean that it is necessarily unreliable.
We are mindful that when reviewing rulings concerning the admissibility of expert testimony, the admissibility of such evidence is entrusted to the sound discretion of the trial court. McKinney v. Schlatter (1997),118 Ohio App.3d 328, 338; Mahan v. Bethesda Hosp., Inc. (1992);84 Ohio App.3d 520, 525; Slaby v. Boyle (June 18, 1999), Ashtabula App. No. 97-A-0086, unreported, at 9, 1999 Ohio App. LEXIS 2807; Fletcher v.Scarantine (Dec. 31, 1996), Trumbull App. No. 95-T-5359, unreported, at 6, 1996 Ohio App. LEXIS 5947.
Thus, the judgment of the trial court will not be disturbed absent an abuse of discretion. Mahan at 525; Slaby at 9; Fletcher at 6. An abuse of discretion connotes more than a mere error of law; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157.
In deciding whether Dr. Gilliland's testimony should have been admitted, we begin our analysis with Evid.R. 702, which governs the admissibility of expert testimony.[3] It provides:
 "A witness may testify as an expert if all of the following apply:
 "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons;
 "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 "(2) The design of the procedure, test, or experiment reliably implements the theory;
 "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
Here, there is no question that Dr. Gilliland is a qualified expert who would have testified about a subject beyond the knowledge of lay persons.[4] Evid.R. 702(A) and (B). We also note that appellee presented his own neurological expert on the subject. Therefore, we must focus our analysis on the only remaining question; to wit, whether the information supporting Dr. Gilliland's theory of peripheral nerve damage was sufficiently reliable to allow its presentation to a jury. Evid.R. 702(C).
The Staff Notes to Evid.R. 702 indicate that the rule does not define "reliability" in the context of admitting expert testimony. Evid.R. 702, July 1, 1994 Staff Note ("Consistently with the intention to do no more than codify exiting holdings on the admissibility of expert testimony, the * * * rule does not attempt to define the standard of reliability but leaves that to further development through case-law."). See, also, State v. Nemeth (1998), 82 Ohio St.3d 202, 209. Instead, "questions of reliability are to be directed at principles and methods used by an expert in reaching his or her conclusions, rather than trying to determine whether the conclusions themselves are correct or credible."Nemeth at 210.
Although appellee argues throughout his appellate brief that Dr. Gilliland's methods are not generally accepted in the relevant scientific community, pursuant to the directives of the Supreme Court of Ohio and the Rules of Evidence, scientific opinions need not enjoy "general acceptance" in order to satisfy Evid.R. 702. Id. Moreover, there is no requirement that there be any agreement at all within the scientific community with respect to the expert's opinion because the credibility of the conclusion and the weight it should convey are issues left to the trier of fact. Id., citing State v. Buell (1986), 22 Ohio St.3d 124,132-133.
While "general acceptance" is not a criterion for admissibility, it may allow a trial court to take judicial notice of certain scientific facts.Nemeth at 210, quoting State v. Williams (1983), 4 Ohio St.3d 53, 57, citing McCormick, Evidence (2 Ed. Cleary Ed. 1972) 491, Section 203. Accordingly, any relevant conclusion supported by a qualified expert should be admitted unless there are other valid reasons for its exclusion. Id.In Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, the Supreme Court of Ohio adopted the four factors first articulated inDaubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579, to be considered when evaluating the reliability of scientific evidence. They are: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. Daubert at 593-594; Miller at 611; Nemeth at 211. It must be emphasized that although these factors may aid a court in determining reliability, none of the four factors are an absolute prerequisite to admissibility. Kumho Tire Co., Ltd. v. Carmichael
(1999), 526 U.S. 137, 144; Daubert at 594; Miller at 611; Nemeth at 211.
Thus, the trial court's role in determining the admissibility of expert testimony, in particular the reliability requirement in Evid.R. 702(C), is a "threshold determination" focusing on the scientific evidence and its underlying principles, not on the accuracy of the ultimate conclusions. Daubert at 595; Miller at 611-612; Nameth at 211. "[T]he reliability requirement of Daubert should not be used to exclude all evidence of questionable reliability, nor should a court exclude such evidence simply because the evidence is confusing." Miller at 614, citing In re Paoli RR. Yard PCB Litigation (C.A.3, 1994), 35 F.3d 717,744. Instead, "the `ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's "technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results."'" Miller at 614, quotingDeLuca v. Merrel Dow Pharmaceuticals, Inc. (C.A. 3, 1990), 911 F.2d 941,956, quoting 3 Weinstein's Evidence (1988) 702-35, Section 702[03].
We now turn to the merits of the case at bar. The record shows that Dr. Gilliland intended to testify that the cause of Mr. Furness' condition was damage to the brachial plexus nerve in the right shoulder. Moreover, Dr. Gilliland opined that the damage to the nerve in question occurred during the arterial bypass operation performed by appellee.[5]
However, Dr. Gilliland never stated the basis for his theory; specifically, whether he relied upon his experience with patients, or just the article in question.
The trial court conducted a hearing on appellee's motion in limine, at which time appellee introduced the following items into evidence: (1) Dr. Gilliland's testimony from the previous trial; (2) a videotape of Mr. Furness; (3) a medical journal article apparently relied upon, in part, by Dr. Gilliland to support his peripheral nerve damage theory; and (4) the findings and opinions of Drs. John Dietrich ("Dr. Dietrich"), Thomas Strachan ("Dr. Strachan"), and Hiroshi Mitsumoto ("Dr. Mitsumoto"). In addition, appellee also called Dr. John Conomy ("Dr. Conomy") as a witness. Appellants did not offer any evidence in rebuttal.
The evidence showed that peripheral nerve damage was a relatively new and untested theory in the medical community. In fact, Dr. Gilliland testified that the authors in the article in question qualified their findings by stating that the idea of peripheral nerve damage was only a hypothesis, and that the criteria relied upon in the study were arbitrary and had yet to be validated. Moreover, the doctor admitted that although he believed an injury to the brachial plexus nerve caused Mr. Furness' condition, the electrodiagnostic testing that had been performed on Mr. Furness could only establish that the problem was located above the wrist. As a result, Dr. Gilliland was unable to pinpoint any nerve injury in the location of the surgery.
Dr. Conomy, the former head of Neurology at The Cleveland Clinic, testified at the hearing that there was no relationship between the surgery and tremor because he could not find evidence of a brachial plexus nerve injury. Instead, he believed that Mr. Furness' condition was the result of an impairment to the anterior interosseous nerve in the right forearm.
In his deposition, Dr. Dietrich, an orthopedic surgeon, also testified that there was no evidence of a brachial plexus nerve injury. Rather, he stated that Mr. Furness' symptoms predated the surgery and were caused by a proximal median nerve palsy located in the right forearm.
Dr. Strachan, who was Mr. Furness' post-operative treating neurologist, opined that there was no evidence of an injury to the brachial plexus nerve, and that the cause of the problem originated in the right forearm and was the result of a pre-existing median nerve entrapment. Moreover, he believed that Mr. Furness' condition was psychologically based, as opposed to nerve related.
Finally, Dr. Mitsumoto, a neurologist with The Cleveland Clinic Foundation, testified in his deposition that the impairment was likely the result of a median nerve injury in the right forearm, and that Mr. Furness' condition was in no way related to the surgery.
Based on this evidence, the trial court concluded that Dr. Gilliland's opinion with respect to Mr. Furness' tremor was unreliable. Accordingly, the court granted the motion in limine. After conducting our own exhaustive review of the entire record before us, this court cannot say that the trial court abused its discretion in doing so.
As we noted earlier, the role of the court in determining the admissibility of expert testimony should focus on the evidence and its underlying principles and not the accuracy of the conclusion. Moreover, the reliability of the expert testimony turns on whether the proposition would be helpful to the trier of fact in reaching the correct result.
Turning to the four factors in Miller, the evidence shows the theory that peripheral nerve damage can cause tremors in a person's extremities is relatively new. In fact, there is very little information available on the subject. The authors of the article mentioned during Dr. Gilliland's testimony at trial clearly state that an injury to the peripheral nervous system may give rise to tremors, but that other causes could not be ruled out. In fact, the authors concluded that individuals who developed tremors after suffering a peripheral nerve injury may have already had a preexisting dysfunction that was not noticed before the trauma.
Furthermore, while general acceptance is not a prerequisite to admissibility as it once was under Frye v. United States (1923),293 F. 1013, surely more than one doctor must find the idea to be beyond a hypothetical possibility before it would be considered admissible in a court of law. Here, only Dr. Gilliland found it be a valid proposition, while two of the doctors, Dr. Conomy and Dr. Mitsumoto, testified that the relationship between peripheral nerve injuries and tremors was not
generally accepted in the medical community. The article itself admitted that the peripheral nerve damage theory is only in the hypothetical stage. In addition, the article also acknowledged that additional testing was necessary before the results of the preliminary studies could be validated, and "no definite conclusions [had] been reached."
Dr. Gilliland admitted that he did not know how the alleged injury occurred, or even where the brachial plexus nerve was damaged. In fact, two MRI's taken of Mr. Furness after the surgery found no pathology within the brachial plexus region. Rather, Dr. Gilliland's assertion that the nerve was damaged was primarily based on the temporal relationship between the date of the surgery and the onset of the tremors. This relationship, however, is insufficient to support Dr. Gilliland's theory, especially in light of his failure to positively identify any injury to the brachial plexus nerve. Moreover, because he was not a surgeon, Dr. Gilliland admitted he could not even say for sure what type of injury, if any, Mr. Furness had suffered.
Therefore, we conclude that the trial court did not err in preventing Dr. Gilliland from testifying as to the cause of Mr. Furness' tremor. The information relied upon by the doctor is both untested and unreliable, and would not assist the trier of fact in reaching a correct result. Appellants' second assignment of error lacks merit.
In their first assignment of error, appellants argue that the trial court erred in granting appellee summary judgment because genuine issues of material fact exist regarding Mr. Furness' alleged permanent nerve damage. In support, they rely exclusively on the testimony of Dr. Gilliland and his conclusion that as a result of the surgery performed by appellee, Mr. Furness suffered a permanent injury to his brachial plexus nerve.
At the outset, we note that summary judgment is proper when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come but to one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); Leibreich v. A.J. Refrigeration, Inc. (1993),67 Ohio St.3d 266, 268.
Material facts are those facts that might affect the outcome of the suit under the governing law of the case. Turner v. Turner (1993),67 Ohio St.3d 337, 340, citing Anderson v. Liberty Lobby, Inc. (1986),477 U.S. 242, 248. To determine what constitutes a genuine issue, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Turner at 340.
The party seeking summary judgment on the grounds that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. Dresherv. Burt (1996), 75 Ohio St.3d 280. The moving party must be able to point specifically to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim. Id. at 293.
If this initial burden is met, the nonmoving party has a reciprocal burden to respond, by affidavit or as otherwise provided in the rule, in an effort to demonstrate that there is a genuine issue of fact suitable for trial. Id. If the nonmoving party fails to do so, the trial court may enter summary judgment against that party if appropriate. Id.
In order to establish a claim for medical malpractice, a plaintiff must satisfy four basic elements: (1) the existence of a duty owed to the plaintiff by the physician; (2) a breach of that duty by the physician; (3) a showing of the probability that the breach was a proximate cause of the harm to the plaintiff; and (4) damages. DiSilvestro v. Quinn (Dec. 31, 1996), Lake App. No. 95-L-061, unreported, at 6-7, 1996 Ohio App. LEXIS 5950, citing Stinson v. England (1994), 69 Ohio St.3d 451. With respect to the second and third elements of the claim, the Supreme Court of Ohio has held:
 "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care, and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, paragraph one of the syllabus. See, also, DiSilvestro at 7.
In applying Bruni, Ohio courts have generally held that the plaintiff in a medical malpractice case must present medical expert testimony in support of his or her claim. Roberts v. Ohio Permanente Med. Group, Inc.
(1996), 76 Ohio St.3d 483, 485. See, also, DiSilvestro at 7-8. Specifically, the plaintiff must present a medical expert who will testify as to the applicable standard of care, the breach of that standard, and proximate cause. DiSilvestro at 8.
After the trial court granted his motions in limine, appellee filed with the court a motion for summary judgment. In this motion, appellee argued that there was no medical evidence in the record that he fell below the relevant standard of care in performing the arterial bypass operation, and there was no medical evidence connecting the onset of Mr. Furness' condition with the surgery. Appellee attached to his motion for summary judgment excerpts from depositions, medical reports prepared by several doctors involved in the case, and Mr. Furness' medical records.
Essentially, appellee argued that appellants could not prove their case because there was no genuine issue of material fact on an essential element of their medical practice claim, i.e., the standard of care and causation. Dresher, supra. Once appellee met his initial burden, appellants were then obligated to respond to his allegations in an effort to demonstrate that there was a genuine issue of fact suitable for trial.
The record shows that appellants did not file a brief in opposition to appellee's motion for summary judgment, and therefore, did not submit opposing evidentiary materials on any of the issues with which they bore the burden of production at trial. Having failed to do so, it was within the power of the trial court to enter summary judgment in appellee's favor if appropriate, Dresher at 293, because the nonmoving party may not simply rest upon the mere allegations or denials contained in his or her pleadings. Jackson v. Alert Fire Safety Equip., Inc. (1991),58 Ohio St.3d 48, 52; Morris v. Ohio Casualty Ins. Co. (1988),35 Ohio St.3d 45, 47; Progressive Casualty Ins. Co. v. Bryan (June 30, 1994), Lake App. No. 93-L-188, unreported, at 4, 1994 Ohio App. LEXIS 2924.
Even when the nonmoving party does not respond to a properly supported motion for summary judgment, however, "summary judgment is improper unless reasonable minds can come to only one conclusion and that conclusion is adverse to the nonmoving party." Morris at 47, citingToledo's Great Eastern Shoppers City, Inc. v. Abde's Black Angus SteakHouse No. III, Inc. (1986), 24 Ohio St.3d 198 . Without expert medical testimony on the standard of care or causation, appellants cannot maintain a cause of action for medical malpractice. Therefore, the trial court did not err in granting summary judgment in favor of appellee. Appellants' first assignment of error is meritless.
Based on the foregoing analysis, the judgment of the trial court is affirmed.
 ___________________________________ JUDITH A. CHRISTLEY, PRESIDING JUDGE
NADER, J., concurs, O'NEILL, J., dissents.
[1] Appellants had voluntarily dismissed their original complaint without prejudice on November 25, 1992.
[2] On appeal, appellants do not challenge the trial court's granting of the motion in limine with respect to the relevant standard of care. As a result, we will confine our discussion to whether or not the trial court properly excluded Dr. Gilliland's testimony concerning the cause of Mr. Furness' tremor.
[3] Evid.R. 702 was amended in 1994. The purpose of the amendment was to clarify the role of expert testimony and to reduce the confusion surrounding the admittance of such evidence. Nevertheless, the drafters of the amended rule were quick to point out that the amendment was not intended to change existing law, including the procedure for challenging and determining the admissibility of expert testimony. Evid.R. 702, July 1, 1994 Staff Notes.
[4] Dr. Gilliland is a practicing neurologist with thirty years of clinical experience.
[5] While Dr. Gilliland believes that appellee damaged the brachial plexus nerve during the surgery, he does not think that the nerve was transected. Rather, it is his opinion that the injury to the nerve was probably caused by appellee pulling or tugging on it during the procedure.