OPINION
Defendant-appellant Travis C. Blamer appeals his conviction and sentence from the Knox County Court of Common Pleas on one count of involuntary manslaughter, in violation of R.C. 2903.04.
 STATEMENT OF THE FACTS AND CASE
On November 3, 1998, defendant-appellant Travis C. Blamer [hereinafter appellant] was secretly indicted by the Knox County Grand Jury on one count of aggravated murder, in violation of R.C. 2903.01(C), with a specification that the victim was under 13 years of age at the time of the commission of the offense, and one count of involuntary manslaughter, in violation of R.C. 2903.04(A). Both charges arose from the death of Legacy Dawn Fawcett, the 17 day old daughter of Kendra Fawcett, appellant's live-in girlfriend. Appellant was arraigned on January 15, 1999, and entered pleas of not guilty to both charges. The trial court ordered that appellant be held without bond. After waiving his right to trial by jury, a trial commenced on November 29, 1999, before a three judge panel. The following facts were elicited at trial: Legacy Dawn Fawcett was born on July 31, 1998. Legacy's mother was Kendra Lee Fawcett. Legacy's father was Zeb Martin. Appellant was Kendra's boyfriend and lived with Kendra and Legacy. Testimony showed that appellant and Kendra cared for the child together. Prior to her death, Legacy suffered visible injuries. In the days before her death, she developed bruises on her chin and forehead. The child's mother testified that appellant attempted to explain the bruises by saying that the bruises occurred when he burped the child. Appellant claimed that the bruise to the forehead was caused by Legacy propelling herself against her crib railing. Legacy had two other medical problems. While being born, Legacy suffered a fracture of the left clavicle. Testimony showed that this injury, which is commonly caused when forceps are used in the birthing process, was likely to make her fussy when touched the wrong way. Legacy also had problems with constipation which made her irritable and uncomfortable. On the night of August 16, 1998, Kendra, the child's mother, remembered going to bed with appellant about 11:00 P.M. At that time, Legacy was asleep in a crib next to the bed. Kendra's brother also was in the house and remained in his bedroom all night. Shortly after going to bed, Kendra got up to feed Legacy. She took the child downstairs and fed her in the livingroom. After changing Legacy's diaper, Kendra took Legacy back up to the bedroom. About 11:30 P.M., Kendra placed Legacy in her crib. About 2:00 A.M., Legacy cried. Kendra testified that appellant got up to tend to the baby. Appellant confirmed in his taped statement to police that he took the baby downstairs around 2:00 A. M. However, Kendra fell back to sleep. Appellant took Legacy downstairs, went to the kitchen and got her a bottle. He then took the baby into the livingroom and started to feed her. Testimony showed that the child usually drank two and one-half ounces from her bottle. However, that night she did not drink more than half an ounce of the formula. Upon feeding her, appellant returned the baby to her crib. At approximately 6:00 A.M., appellant got up and went to Legacy. Kendra testified that appellant carried Legacy downstairs. Approximately five minutes later, appellant came back up the stairs and handed Kendra the baby, saying, "He didn't think she was breathing." TR221. Kendra immediately noticed that Legacy was "cold, very cold; very, very white." TR 221. Kendra also testified that she saw what appeared to be "a bite mark on her [Legacy's] leg." Appellant drove himself, Kendra, Legacy and his dog to the hospital. Upon arrival at the hospital, the hospital confirmed that Legacy was dead. Testimony showed that the child had several marks and bruises, the most notable of which were a bite mark to the left foot, bite marks to both legs, bite marks to each thigh, a spiral fracture of the right femur, which caused the thigh bone to be broken into two parts, and bite marks on the left side of her torso. However, Legacy was killed by a blunt impact to the head which caused contusional tears of the brain and a rapid death. An autopsy revealed that the marks on Legacy's head corresponded to marks commonly caused by a hand, specifically knuckles. Defendant-appellant did not testify in his own defense. At the conclusion of the testimony, on December 1, 1999, the three judge panel returned a verdict of not guilty to the charge of aggravated murder. However, appellant was found guilty of involuntary manslaughter, in violation of R.C. 2903.04, a felony of the first degree. A pre-sentence investigation was ordered. A sentencing hearing was held on February 28, 2000. By Judgment Entry filed February 29, 2000, appellant was sentenced to ten years of incarceration, the maximum term allowable by law. It is from the February 29, 2000, Judgment Entry of conviction and sentence that appellant prosecutes this appeal, raising the following assignments of error:
 ASSIGNMENT OF ERROR I THE COURT ERRED IN ADMITTING THE TESTIMONY OF A FORENSIC DENTIST AS THE TESTIMONY DOES NOT MEET THE THRESHOLD OF ADMISSIBILITY UNDER OHIO LAW.
 ASSIGNMENT OF ERROR II A VERDICT OF INVOLUNTARY MANSLAUGHTER IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE WHERE THE ONLY TESTYIMONY [SIC] AT TRIAL OF DEFENDANT'S GUILT IS BASED UPON AN IMPERMISSIBLE STACKING OF INFERENCES.
 ASSIGNMENT OF ERROR III THE TRIAL COURT ERRED IN SENTENCING DEFENDANT TO THE MAXIMUM SENTENCE ALLOWED BY LAW IN VIOLATION OF LAW.
 I
In the first assignment of error, appellant contends that the trial court erred when it admitted the testimony of a forensic odontologist, Dr. Franklin D. Wright, Jr. Specifically, appellant asserts that (1) Dr. Wright merely testified that he was a licensed Ohio dentist who occasionally lectured regarding his theories on bite mark analysis; (2) Dr. Wright did not testify that he had ever been qualified as an expert in forensic dentistry in the past; (3) Dr. Wright's work has not been subject to peer review or gained acceptance in the scientific community. Appellant asserts that these criteria are necessary for the admission of scientific evidence. Lastly, appellant contends that the challenged testimony was prejudicial to appellant. Dr. Wright testified as to his comparisons of the bite marks left on the child and the dental, or teeth, patterns of the persons who were known to be in the house on the night of the child's death. By comparing the patterns, Dr. Wright was able to exclude Kendra and her brother but could not exclude appellant as someone who may have bitten the child. Initially, we note that a trial court enjoys broad discretion in the admission and exclusion of evidence and will not be reversed absent a clear abuse which has materially prejudiced the defendant. State v. Hymore (1967), 9 Ohio St.2d 122 . This deference is particularly appropriate as to the determination as to whether a witness is qualified to render an expert opinion. State v. Maupin (1975), 42 Ohio St.2d 473. Further, courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met. See State v. Williams (1983),4 Ohio St.3d 53, 57-58, 446 N.E.2d 444, 447. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evidence Rule 702 states: A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
First, we note that it was alleged that appellant bit the child at or about the time of the child's death. Whether appellant bit the deceased child several times at or about the time of her death is relevant to whether appellant further assaulted the child by striking a fatal blow to the child's head. Therefore, since the testimony is relevant, we will consider whether the expert testimony is admissible pursuant to Evid.R. 702, in light of appellant's arguments. Appellant claims that Dr. Wright merely testified that he was a licensed dentist who occasionally lectured on his theories regarding bite mark analysis and Dr. Wright did not testify that he had previously been qualified as an expert witness in bite mark analysis by another court. We perceive appellant's argument as a challenge as to whether Dr. Wright was qualified as an expert by specialized knowledge, skill, experience, training, or education regarding bite mark analysis, pursuant to Evid.R. 702(B). Upon review of Dr. Wright's testimony, we find that Dr. Wright testified to significantly more qualifications and credentials than appellant recited to this court. Dr. Wright testified that he was a licensed dentist in the State of Ohio, since 1984, with a general dentistry practice since 1984 and has had a forensic consulting practice since about 1986. TR 280-281. Further, Dr. Wright testified to his professional affiliations and associations: A. I'm a fellow in the American Academy of Forensic Sciences in the odontology section; and a member of the American Society of Forensic Odontology; I'm a diplomat of the American Board of Forensic Odontology; American Dental Association; Ohio Dental Association; and Cincinnati Dental Society. Q. Doctor, in the world, how many diplomats are there of the Board of Forensic Odontologists? A. American Board of Forensic Odontologists has certified approximately 100 since 1976 when it was born. TR 218 — 282.
Dr. Wright testified that he has lectured on the topic of bite mark evaluation in the United States and South America. TR 282-283. Further, Dr. Wright provided highlights of the articles he has published: A. I have published in the Cincinnati Dental Society bulletin an article on forensic odontology, which was an overview. I have published in a couple of text books. I believe it was the second edition of American Society of Odontology Textbook, Forensic Odontology. A section in there on dental identification. I'm sorry. That was dental radiography. The third edition I published a chapter on dental identification, same manual. And I published a chapter on forensic photography. That forensic photography published with CRC Press in 1997. I published some peer review journals. I published some other articles as well related to that. TR 281.
We find Dr. Wright possessed significant specialized knowledge, skill, experience, training, or education in forensic dentistry, including bite mark identification. Therefore, the requirements of Evid.R. 702(B) was met. The last remaining question is whether Dr. Wright's testimony was reliable, in accordance with Evid.R. 702(C), which states: (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) The design of the procedure, test, or experiment reliably implements the theory; (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
It is clear that Dr. Wright's testimony was based upon scientific, technical, or other specialized knowledge. The question raised by appellant is whether the information supporting Dr. Wright's testimony was sufficiently reliable. In Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607, 687 N.E.2d 735, the Ohio Supreme Court identified the following four factors to be considered in evaluating the reliability of scientific evidence: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. These factors were adopted from Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579,593-594, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469, 482-483. Both the United States Supreme Court in Daubert and the Ohio Supreme Court in Miller were careful to emphasize that none of the factors is a determinative prerequisite to admissibility. State v. Nemeth (1998), 82 Ohio St.3d 202,211 (citing Miller at 612-613, 687 N.E.2d at 741; Daubert at 593,113 S.Ct. at 2797, 125 L.Ed.2d at 483). Further, relevant evidence based upon valid principles satisfy the threshold reliability standard for the admission of expert testimony. Id. at 211. The credibility of any such principles and the expert's conclusions remain a matter for the trier of fact. Id. Appellant argues that Dr. Wright `s work had not been subject to peer review and his analysis had not gained acceptance in the scientific community. Appellant asserts that these criteria are necessary for the admission of scientific evidence. As noted above, such factors are to be considered by the trial court but are not determinative. This court further notes that bite mark identification testimony has been presented by forensic odontologists in other cases. See State v. Hill (1992), 64 Ohio St.3d 313, 316-317, 595 N.E.2d 884; State v. Sapsford (1983), 22 Ohio App.3d 1, 488 N.E.2d 218; People v. Slone (1978),76 Cal.App.3d 611, 625, 143 Cal.Rptr. 61, 70 (recognized that bite mark identification process by forensic dentists was used in Europe and Scandinavia since 1924 and as reliable, scientific evidence which has been accepted by the scientific community). Further, we note that while appellant's counsel objected to Dr. Wright's testimony initially, counsel chose not to cross examine Dr. Wright on the reliability or acceptance of the procedures he used in his analysis. Appellant's counsel focused solely upon the results and conclusions of Dr. Wright's analysis and did not present an expert witness on appellant's behalf. Therefore, the record is devoid of testimony challenging Dr. Wright's methodology or its acceptance by the scientific community. Upon review, we find that the trial court did not abuse its discretion in admitting Dr. Wright's expert testimony. However, we find that even if it was an abuse of discretion to admit Dr. Wright's testimony, there was no prejudice to appellant. Several other witnesses testified that the marks on the child looked like bite marks and photographs of the bite marks were presented for review by the trier of fact. Appellant, in a taped statement to police, which was admitted into evidence, stated that a pet dog "jumps on my back and while I was kissing her [Legacy] and that's where she got that teeth mark on her leg from was my mouth hit her right leg there where I was kissing it." Statement of Appellant, pg. 3. Two other witnesses testified that appellant provided the same explanation to them as to how appellant had come to bite the child. Further, in regard to the injury to the child's left foot, the baby's mother testified that appellant attempted to explain how that injury occurred, by telling her that "[h]e was holding her feet with his mouth as he was changing her diaper." TR 232 -233. In sum, there was testimony, in addition to Dr. Wright's, showing that at least some of the bite marks were caused by appellant. Therefore, Dr. Wright's testimony was, for the most part, redundant. Appellant's first assignment of error is overruled.
 II
In the second assignment of error, appellant argues that his conviction was against the manifest weight and sufficiency of the evidence. Specifically, appellant argues that the only way the trier of fact could have convicted appellant was to infer from the erroneously admitted testimony of Dr. Wright that appellant inflicted the bite marks on the child and, from there, infer that if appellant caused those injuries, appellant probably killed the child. On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. See also, State v. Thompkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin,20 Ohio App.3d at 175. Further, a trier of fact may base a conviction upon direct or circumstantial evidence. Circumstantial evidence is "the proof of certain facts and circumstances in a given case, from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind." State v. Duganitz (1991), 76 Ohio App.3d 363, 367, 601 N.E.2d 642 (citing Black's Law Dictionary). Direct and circumstantial evidence are to have the same value. State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. We note that on our review under manifest weight, this court is to consider all reasonable inferences. State v. Martin, supra; State v. Thompkins, supra. Appellant argues that the only way the trier of fact could have convicted appellant was if they first inferred from the erroneously admitted testimony of Dr. Wright that appellant inflicted the bite marks on the child and then from there, inferred that if appellant caused those injuries, he probably killed the child. Appellant cites this court to two civil negligence cases in support of his argument that the trier of fact impermissibly drew an inference from an inference. See Boles v. Montgomery Ward Co. (1950), 153 Ohio St. 381, 388-89, 92 N.E.2d 9; Cupp v. Zoz (Dec. 27, 1994), Butler App. No. CA94-06-122, unreported. First, we have found that Dr. Wright's testimony was admissible, as discussed in assignment of error I. Second, the conviction was not based solely upon inferences that if appellant bit the child, appellant must have killed the child. There was evidence that appellant was the only person to have contact with the child from the time she was put to bed, at around 11:30 P.M., until she was found either dead or near death at 6:05 A.M. There was uncontroverted evidence that appellant rose to feed the child at 2:00 A.M. Dr. Fardal, the forensic pathologist who conducted the autopsy, testified that the time of death could have been as early as 2:00 A.M. Further, while the child generally drank two and one-half ounces of formula at each feeding, that night the child drank only one half of an ounce of formula. By approximately, 6:05 A.M., when appellant brought the child to Kendra Fawcett, the child's mother, the child was very cold and very white and possibly not breathing. Additionally, the child's injuries were not consistent with an accident. The child suffered a broken, twisted leg injury, described as a spiral fracture, at or around the time of death. Such a fracture required a "tremendous and direct force, such as a twisting or a wrenching kind of force. . . ." Appellant attempted to explain the broken leg by claiming it may have happened when a dog jumped on the child. Testimony also showed that the child had a bruise to her forehead. Appellant claimed that the child got the bruise when she propelled herself against the railing of her crib. However, Dr. Charles F. Johnson, a pediatrician, testified that such an explanation was highly unlikely. Dr. Johnson testified that a 17 day old baby was not capable of the movements nor creating the amount of force necessary to cause such a bruise to her head. As to the fatal blow to the child's head, Dr. Fardal, the forensic pathologist, testified that it took a "moderate amount to a severe amount" of force. TR 103. Appellant correctly points out that there is no direct evidence that appellant killed the child. However, what appellant describes as the improper stacking of inferences regarding the bite marks, this court finds to be reasonable inferences and circumstantial evidence upon which the conviction could be based. Dr. Wright, a forensic odontologist, testified that the child bore human bite marks. Dr. Wright could rule out the other known occupants of the home that night as the assailant, but could not rule out appellant. While we recognize that Dr. Wright's testimony did not conclusively demonstrate that the bite marks were from appellant, appellant admitted that at least two of the bite marks were his. Appellant then attempted to explain how the bite marks came to be on the child. He told witnesses, including the police investigator in a taped interview, that one of the bites occurred when he was kissing the child and his dog jumped on his back. He attempted to explain another bite mark by saying that it occurred when he held the child's foot in his mouth to change the child's diaper. The trier of fact was able to judge the witnesses' credibility and the credibility of appellant's explanations. Further, we note that there was evidence that the bite marks were received at or around the time of the child's death. The child's mother, Kendra Fawcett testified that the bite marks were not present when she changed the child's diaper between 11:00 — 11:30 P.M. the night of the child's death. Tr. 233. The child's mother first saw the bite marks when appellant brought the child to her the next morning and while on the way to the hospital. Tr. 233 — 234 and 236. We find that if the trier of fact believed that the bite marks were received at or around the time of death and rejected appellant's explanation as to how the bite marks occurred, any inference that appellant further assaulted the child and struck her in the head was reasonable and permissible. This inference is further supported by the evidence that appellant was the only person to have contact with the child at or around the time she received the fatal blow to her head. Therefore, while we find that the conviction is based upon circumstantial evidence, we do not agree that the appellant's conviction was based upon insufficient evidence or against the manifest weight of the evidence. Upon the record before this court, we cannot find that the trier of fact lost its way or created a manifest miscarriage of justice. Appellant's second assignment of error is overruled.
 III
In his third assignment of error, appellant argues that the trial court's sentence is contrary to law because in sentencing appellant to the maximum sentence under law, the trial court gave only cursory attention to the factors set forth in R.C. 2929.12 and R.C. 2929.13. Appellant submits that the trial court ignored several mitigating factors in arriving at its sentencing decision. Revised Code 2953.08 directs this court to modify or vacate a sentence if we clearly and convincingly, find, inter alia, that the record does not support the sentence or if it is contrary to law. The statute directs us to review the record, including pre-sentence reports, the trial record, the record of the sentencing hearing, and any written findings the trial court may have made. It is pursuant to this standard of review that we consider appellant's assignment of error. Initially, we note that R.C. 2929.13
establishes a presumption that when an offender is convicted of a felony of the first degree, a prison term is necessary in order to comply with the purposes and principles of sentencing pursuant to R.C. 2929.11. This presumption may be overcome only if the trial court finds both of the following: (1) A community control sanction or a combination of community control sanctions would adequately punish the offender and protect the public from future crime, because the applicable factors under section2929.12 of the Revised Code indicating a lesser likelihood of recidivism outweigh the applicable factors under that section indicating a greater likelihood of recidivism. (2) A community control sanction or a combination of community control sanctions would not demean the seriousness of the offense, because one or more factors under section2929.12 of the Revised Code that indicate that the offender's conduct was less serious than conduct normally constituting the offense are applicable, and they outweigh the applicable factors under that section that indicate that the offender's conduct was more serious than conduct normally constituting the offense. R.C. 2929.13(D).
Further, to impose a maximum sentence, the trial court must find that the offender either poses the greatest likelihood of recidivism or committed the worst form of the offense. R.C. 2929.14(C) The statute is written in the disjunctive. Therefore, the trial court may impose the maximum sentence if either category applies. State v. Jamiseon (Aug. 15, 2000), Ashland App. No. 99COA01346, unreported. Lastly, when the trial court imposes the maximum sentence, it must state its reasons for doing so. R.C. 2929.19(B)(2)(d). In the Judgment Entry, the trial court found "that the Defendant committed the worst form of the offense he was found guilty of in that he beat to death a 17 day old child that had been entrusted to his care. The Court further finds that the Defendant poses the greatest likelihood of committing future crimes based on his anti-social and violent past." Therefore, the trial court made the requisite findings to impose the maximum sentence, including its reasons for imposing the maximum sentence. However, appellant argues that the trial court gave only cursory attention to the factors set forth in R.C.2929.12 when it considered appellant's likelihood of recidivism and whether the crime for which appellant was convicted the worst form of the offense. Appellant contends the trial court ignored mitigating factors. We agree that a trial court should consider all relevant factors including, but not limited to, those factors listed in R.C. 2929.12. State v. Kalmen (Nov. 15, 2000), Ashland App. No. 00-COA-1348, unreported. However, the weight to be given to the factors in R.C. 2929.12
is within the discretion of the trial court. Id. Revised Code 2929.12 provides the following factors for the trial court's consideration in determining the seriousness of the offender's conduct and the likelihood that the offender is likely to commit future offenses: (B) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is more serious than conduct normally constituting the offense: (1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim. (2) The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense. (3) The offender held a public office or position of trust in the community, and the offense related to that office or position. (4) The offender's occupation, elected office, or profession obliged the offender to prevent the offense or bring others committing it to justice. (5) The offender's professional reputation or occupation, elected office, or profession was used to facilitate the offense or is likely to influence the future conduct of others. (6) The offender's relationship with the victim facilitated the offense. (7) The offender committed the offense for hire or as a part of an organized criminal activity. (8) In committing the offense, the offender was motivated by prejudice based on race, ethnic background, gender, sexual orientation, or religion. (9) If the offense is a violation of section 2919.25 or a violation of section 2903.11,2903.12, or 2903.13 of the Revised Code involving a person who was a family or household member at the time of the violation, the offender committed the offense in the vicinity of one or more children who are not victims of the offense, and the offender or the victim of the offense is a parent, guardian, custodian, or person in loco parentis of one or more of those children. (C) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is less serious than conduct normally constituting the offense: (1) The victim induced or facilitated the offense. (2) In committing the offense, the offender acted under strong provocation. (3) In committing the offense, the offender did not cause or expect to cause physical harm to any person or property. (4) There are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense.
(D) The sentencing court shall consider all of the following that apply regarding the offender, and any other relevant factors, as factors indicating that the offender is likely to commit future crimes: (1) At the time of committing the offense, the offender was under release from confinement before trial or sentencing, under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or under post-release control pursuant to section 2967.28 or any other provision of the Revised Code for an earlier offense. (2) The offender previously was adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code, or the offender has a history of criminal convictions. (3) The offender has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code, or the offender has not responded favorably to sanctions previously imposed for criminal convictions. (4) The offender has demonstrated a pattern of drug or alcohol abuse that is related to the offense, and the offender refuses to acknowledge that the offender has demonstrated that pattern, or the offender refuses treatment for the drug or alcohol abuse. (5) The offender shows no genuine remorse for the offense.
(E) The sentencing court shall consider all of the following that apply regarding the offender, and any other relevant factors, as factors indicating that the offender is not likely to commit future crimes: (1) Prior to committing the offense, the offender had not been adjudicated a delinquent child. (2) Prior to committing the offense, the offender had not been convicted of or pleaded guilty to a criminal offense. (3) Prior to committing the offense, the offender had led a law-abiding life for a significant number of years. (4) The offense was committed under circumstances not likely to recur. (5) The offender shows genuine remorse for the offense. In this case, the trial court made the following comments at the sentencing hearing, which were echoed in the Judgment Entry of Sentencing: JUDGE EYSTER: . . . For the record, the Defendant, Travis Blamer, stands before the Court having been convicted of one count of involuntary manslaughter in violation of Revised Code Section2903.04, a felony of the first degree and subject to division (B) of the Revised Code Section 2929.13. In considering the purposes and principles in Revised Code Section 2929.11, it is the Court's intention to punish the Defendant and protect the public from future crime by this offender and others. The Court has considered the need for incapacitation, deterrence, rehabilitation and restitution. The Court finds its sentence commensurate with, and not demeaning to the seriousness of the Defendant's conduct and its impact on the victims, and is consistent with sentences for similar crimes by similar offenders. The Court's sentence is not based on the Defendant's race, ethnicity, gender or religion. The Court has considered the seriousness and the recidivism factors in Revised Code Section 2929.12 and finds the following: The physical injury suffered by the victim was exacerbated because of the age of the victim, to wit, 17 days old. The victim of the offense suffered serious physical injury resulting in the victim's death. The Defendant's relationship with the victim, that of caregiver, facilitated the offense. The Defendant has previously been adjudicated a delinquent child pursuant to Revised Code Chapter 2151. The Defendant has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child pursuant to Revised Code Chapter 2151. The Defendant has shown no genuine remorse for this action. I want to explain, Mr. Blamer, I don't question — and I think I speak on behalf of my colleagues — — the fact that you feel bad that this child is no longer alive, but that's not what the Court considers remorse. For the reason stated, and after consideration of the factors under Revised Code Section 2929.12, the Court finds that prison is consistent with the purpose of Revised Code Section 2929.11, and the Defendant is not amenable to an available community control sanction. It is therefore the order of the Court that the Defendant be sentenced to a definite term of imprisonment of ten years, the maximum sentence for a felony of the first degree. The Court specifically finds that the Defendant committed the worst form of the offense he has been found guilty of in that he beat to death a 17 day old child that had been entrusted to his care. The Court further finds that the Defendant poses the greatest likelihood of committing future crimes based on his anti-social and violent past.
T. at 17 — 20. It is apparent from the record that the trial court considered the factors enumerated in R.C. 2929.12 and was aware of the alleged mitigating factors. The trial court had a pre-sentence investigation report before it for consideration and appellant's counsel presented the trial court with the details of appellant's childhood at the sentencing hearing. The trial court not only acknowledged that it had considered the factors enumerated in R.C. 2929.12 but identified those that the trial court found applicable. While appellant may argue that the trial court should have found appellant's difficult childhood a significant mitigating factor, we cannot find that the sentence imposed by the trial court was clearly and convincingly contrary to law when the trial court acknowledged that it considered R.C. 2929.12. Appellant was sentenced for the death of a 17 day old baby who suffered a painful, violent death. We find that the trial court's sentence was not contrary to law when it imposed a maximum sentence.
Appellant's third assignment of error is overruled. The judgment of the Knox County Court of Common Pleas is affirmed.
Edwards, J. Farmer, P.J. and Reader, V.J. concur