OPINION
{¶ 1} Plaintiffs-appellants Terrance Asbury (legal guardian and spouse of *Page 2 
Brenda Asbury), Sean Asbury, Trenton Asbury, Ian Asbury, and Jerry Taylor, executor of the estate of Jean Taylor, appeal from a summary judgment rendered in favor of defendants-appellees EZ Lock, Inc. and Key Mobility Services, Ltd.
 {¶ 2} The Asburys and Taylor contend that the trial court erred in excluding the testimony of their expert, Dr. Wiechel, for insufficient reliability under Evid. R. 702 and Daubert v. Dow Pharmaceuticals
(1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. The Asburys and Taylor argue that Dr. Wiechel's qualifications were exemplary, and that his methodology was adequately tested, was subject to ample peer review, enjoyed a low rate of error, and has garnered general acceptance in the scientific community.
 {¶ 3} We conclude that the trial court did not abuse its discretion in excluding Dr. Wiechel's testimony. Although Dr. Wiechel's expert credentials were not in question, his testimony did not comply with Evid. R. 702(C), because his theories were not objectively verifiable and the tests, to the extent any tests were performed, did not reliably implement his theories and were not conducted in a way that would yield an accurate result. Once Dr. Wiechel's testimony was excluded, there was no evidence to causally connect any alleged actions or inactions of EZ Lock or Key Mobility to the injuries that occurred. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 4} This case involves an auto accident that took the life of Jean Taylor and severely injured Jean's adult daughter, Brenda Asbury. On January 25, 2003, Jean Taylor, Brenda Asbury, and Brenda's best friend, Patricia Miller, went shopping. They ended up at Gordon Food Supply (GFS), where they made several purchases. After the *Page 3 
women left the store, Patricia put her purchases in the back seat of the car, which was a Ford Escort. Brenda and her mother were at the rear of the Escort, placing their items in the trunk, when they were struck by a 1988 Ford 150 Econoline van driven by Eric Bigler. The two women were thrown into the air and landed in the parking lot. Jean died at the scene and Brenda sustained significant permanent injuries.
 {¶ 5} At the time of the accident, Bigler was a forty-five year old quadriplegic who had been disabled since the age of fifteen, after breaking his neck in a swimming accident. Bigler obtained driving privileges in the late 1980's, and his van was originally modified in 1989 with zero effort steering and braking, which made the van easier to steer and brake than normal vehicles. Due to restricted mobility in Bigler's fingers and hands, a tri-pin mechanism was attached to the steering wheel. Once Bigler's left hand was in the mechanism, he could push forward to brake and push back to accelerate. He could also activate turn signals by flipping the device to the left or the right.
 {¶ 6} The van was equipped with a headrest that was attached to the top left-hand side of the vehicle. The headrest went behind Bigler's head and contained several buttons that allowed him to activate various functions like the horn, cruise control and headlights, simply by using his head. In addition, the van was equipped with a wheelchair docking system manufactured by EZ Lock.
 {¶ 7} The EZ Lock system was installed in 1997. It contained a wheelchair locking device mounted on the floor of Bigler's van with grade eight bolts. The locking device contained a slot and two jaws (a locking lever and a rotating lever) that were ready to receive a bolt that would slide into the slot. Bigler's wheelchair was equipped with a bracket and a grade eight bolt on the bottom of the chair. As the wheelchair *Page 4 
passed over the locking device, the locking and rotating levers rotated counterclockwise, closed around the bolt, and locked. The wheelchair was then locked in and was prevented from moving while the van was being operated.
 {¶ 8} An alarm was attached to the locking device and sounded loudly if the wheelchair was not properly locked in. The alarm would not sound until the ignition was turned on. Once the ignition key was turned on, the alarm sounded and would continue to sound until the driver locked into position. However, the system did have a switch that allowed the user to deactivate the alarm. The locking device also made an audible click — a metal-to-metal noise — when the wheel chair was locked in.
 {¶ 9} Key Mobility was the company that installed the EZ Lock system in 1997. The locking system was originally designed to be used with Bigler's new wheelchair, which was a Quickie P300 model. Bigler operated the van for some months with this wheelchair, but it was uncomfortable. As a result, Bigler asked Key Mobility to fit a bracket on an older chair that he owned, which was an Invacare Action Arrow model. The Action Arrow was an older model, belt-driven wheelchair with large rear wheels and a center of gravity forward of the wheels. In contrast, modern wheelchairs have a direct drive and much tighter turning radiuses. The wheels on modern chairs are smaller than those on the older wheelchairs (10 inches as opposed to the 20-22 inch wheels on the Action Arrow).
 {¶ 10} Over time, EZ Lock became aware that the modern chairs had a tendency to move laterally or tip back upon acceleration due to the smaller wheels and the location of the center of gravity. Consequently, EZ Lock began requiring use of a front stabilizer bar with the locking device for all driver applications, beginning in 1998 or *Page 5 
1999. In these applications, a bracket is installed underneath the wheelchair. The bracket contains a tongue that fits into the stabilizer bar, which is installed on the vehicle. The tongue does not latch, but simply docks into a space on the stabilizer bar. The purpose of the stabilizer bar is to keep the chair from tipping forward or backward or rocking. EZ Lock required the use of the stabilizer bar because of the introduction of the new wheelchairs with smaller diameter wheels. EZ Lock did not have an actual program of notification about the stabilizer bar requirement; instead, EZ Lock communicated this to dealers when they called about particular installations of the EZ locking device.
 {¶ 11} In 1997, there was no recommendation or option for a stabilizer bar on the Action Arrow type of wheelchair because this type of chair was not subject to the tipping that the stabilizer was intended to counter. Chairs like the Action Arrow did not tip, nor did they have unforseen movement. This was due to the size of their rear wheels and the fact that the mass of the chair, the batteries, and the individual's weight were all forward of the drive axles.
 {¶ 12} A wire broke two or three years after the original installation of Bigler's EZ Lock system, and prevented Bigler from unlocking the device. Consequently, Bigler had a mechanic attach a red wire to the locking mechanism that Bigler could pull to manually release the chair. After Key Mobility repaired the broken wire, Bigler did not remove the red manual release wire. However, Bigler stated that he never used the manual release wire again. Bigler indicated that if the alarm system were turned on and he was locked into the EZ lock device, the alarm would sound if the manual release were tripped. Therefore, Bigler would have been aware on the day of the accident if the manual release wire had been accidentally tripped. Bigler had no problems with the locking *Page 6 
device or the alarm system before the accident.
 {¶ 13} The accident occurred on a Saturday afternoon shortly before 2:00 p.m. That day, Bigler had attended a volunteer appreciation luncheon at the Dayton Art Institute. When Bigler attempted to leave the Institute, he discovered that someone had blocked his way and he could not get into the van. A guard came out, opened up the driver's door, and turned the key to put the car in neutral. The guard then pushed the van back so that Bigler could access the lift to get in the van. When the guard turned on the ignition, the alarm sounded and continued to sound until Bigler drove his wheelchair into the docking system.
 {¶ 14} After leaving the Art Institute, Bigler drove to Hara Arena to attend a boat show. He stayed at the show about half an hour and then got back into the van to drive home. The locking device operated as it always had before. He locked in, turned on the engine, heard no noise, and left. The power to the wheelchair may have been on, but the clutch was activated, which would have prevented free spinning of the wheels.
 {¶ 15} On the way home, Bigler drove down Needmore Drive, which turns into Harshman Road after Needmore intersects with Brandt Drive. Bigler stopped at a number of red lights along the way and had no warning that anything might be wrong. When Bigler arrived at the intersection of Brandt Pike and Needmore/Harshman, he was in the right-hand lane. Bigler needed to move into the left-hand lane because he had decided to stop at a Meijer store. The entrance to the store was located farther up on Harshman, on the left-hand side of the road. A car was next to Bigler at the stop light at Brandt and Harshman. Bigler was the first car in his lane at the traffic light and more than half of his van was in front of the car in the left lane. When the light turned green, *Page 7 
Bigler accelerated enough so that he could move in front of the car.
 {¶ 16} Bigler testified that when he accelerated, his chair broke loose from the locking device and moved backwards between six and eighteen inches. This caused Bigler's hands to come out of the braking and steering mechanisms, and he lost control of the van. A witness in the right-hand lane of traffic behind Bigler's van testified that the van swerved left and then right and was out of control. The van swerved back and forth several times, and then it slowed down and began to go straight, so the witness thought everything was all right. As the van began to go straight, it suddenly made a hard right and traveled up onto the grass on the median. The van went over the sidewalk and into the GFS parking lot, where it hit two women and some cars.
 {¶ 17} A witness, Mary Jo Lebourne, was coming out of GFS and saw the van coming toward the parking lot. Mrs. Lebourne observed the arms of the driver flailing, and she did not see the driver's hands return to the steering wheel until the van came to a stop. When the collision stopped, Mrs. Lebourne observed the driver for a second. She stated that the driver was not close to the steering wheel. In contrast, another witness who walked up to the van within a moment or two of the crash stated that the driver of the van was in his wheelchair, right at the wheel, within arms reach.
 {¶ 18} Bigler himself testified that when his chair rolled back, the seatbelt turned off the power to his chair and he could not drive the chair back into the locking device. Bigler went back at an angle and the left foot pedal hit the side of the door. When the van hit the curb, the chair was pushed forward, with the chair being towards the door and his body angled towards the console. On impact with the other car and the individuals, Bigler's chair was pushed forward at an angle toward the door, but his body *Page 8 
was twisted toward the steering column. When Bigler came forward, he was concerned about a potential fire, so he hit the ignition with his hand and turned off the engine. Bigler did not sustain any injury in the accident.
 {¶ 19} Bigler made a number of statements at the scene, including the fact that the wheelchair came loose. However, he also told a paramedic that he was adjusting his wheelchair, which was not locked in, when he lost control and went over the curb. Accident reconstruction indicated that Bigler's speed was about 39-40 miles per hour when he went up over the curb, and about 24-27 miles per hour when he hit the Escort. There was no evidence of any braking.
 {¶ 20} The police took custody of the van and locking device immediately after the accident. Because of Bigler's claim that the lock had malfunctioned, Detective McDonald of the Dayton Police Department asked Thomas Strehle, of Motorwerks, to test the system. Motorwerks was an authorized EZ Lock dealer and installer, and Strehle had training in wheelchair accessible vehicles.
 {¶ 21} Strehle came to the police department twice to test the system. On the first occasion, the wheelchair was not available, so Strehle used a screwdriver to verify that the buzzer and release were working properly. Subsequently, on January 29, 2003, McDonald and Officer Gibson took Bigler's wheelchair to the location where the van was stored. Strehle tested the locking system and wheelchair using a person of Bigler's approximate size. Strehle found that the system worked properly. The bolt was secure and at the perfect height. The bolt was not worn or eroded and there were no problems with the bolt at all. Strehle indicated that Bigler's account of the accident was not possible if Bigler had been locked into the system initially. *Page 9 
 {¶ 22} At the time of the accident, Bigler was insured by Liberty Mutual Insurance Company. Thomas Horency was the Liberty Mutual adjuster who handled the Taylor and Asbury claims. Horency spoke with the Taylor and Asbury families within a few weeks of the accident. Horency also spoke with Bigler, acquired the police report, and took photos of the accident scene. After sharing the information with his supervisor, Pat Fuerterer, Horency and Fuerterer decided that it was necessary to look at the devices in the van. Horency, therefore, hired engineer Daniel Aerni around February 20, 2003, to determine if anything was wrong with the wheelchair locking device and associated alarm system that could have caused or contributed to the accident. About five days later, Aerni went to Co-Parts, a salvage yard in Columbus, Ohio, where the van was being housed. The decision to place the van at a salvage yard would have been made by a separate department (the Total Loss and Salvage Department) at Liberty.
 {¶ 23} While at Co-Parts, Aerni tested the lock device and alarm system by turning on the power to the car and using a screwdriver to stimulate the lock. With the key switch on and the master switch for the alarm on, Aerni was unable to create a situation in which the alarm failed to function when the jaws were unlocked. Aerni sent Horency a report dated March 5, 2003, which stated that the wheelchair docking device and alarm system were properly functioning at the time of his tests. In his deposition, Aerni stated to a reasonable degree of scientific certainty that there was no reason to believe that a defect existed in either the locking device or the alarm system.
 {¶ 24} Horency did not conduct further investigation after receiving Aerni's report. He recommended paying policy limits for the Taylor claim, but was unable to resolve matters with the Asburys. Ultimately, the policy limits were paid after the Asburys *Page 10 
retained counsel.
 {¶ 25} Although Horency and Fuerterer discussed retention of the van and the locking system in the beginning, Horency did not oversee the issue of the retention of the van. After Aerni's report was received, Fuerterer managed the claim as far as determining whether the vehicle should be sold or retained. Liberty sold the van at auction in May, 2003.
 {¶ 26} Around July or August, 2003, Horency was contacted by Lee Falke, who indicated he would be representing the Asburys. Falke requested the location of the van and also asked Liberty to preserve the vehicle. Horency told Falke's office that the van was at Co-Parts in Columbus. However, Horency later learned that this was incorrect and that the van had already been disposed of at auction by the time the Asburys' counsel asked about its location.
 {¶ 27} In January 2005, the Asburys and Taylor filed suit against Key Mobility and EZ Lock. The claims against EZ Lock were based on strict liability for the defective design and distribution of the EZ lock system, negligent design and distribution of the system, res ipsaloquitur, defective design under R.C. 2307.75, failure to warn under R.C. 2307.76, failure of the product to conform to manufacturers' representations under R.C. 2307.77, common law negligence, and implied breach of warranty. The claims against Key Mobility were based on supplier or distributor liability under R.C. 2307.78, strict liability for distribution and installation, negligent distribution and installation, and res ipsa loquitur.[1] *Page 11 
 {¶ 28} During discovery, the Asburys and Taylor identified Dr. John Wiechel as their expert, and opposing counsel then deposed Dr. Wiechel on several occasions. Dr. Wiechel was well qualified, as he had attained a doctorate in mechanical engineering in 1983, and had been employed by SEA, Ltd., for many years as a technical consultant in the areas of biomechanics, automotive impact mechanics, mechanical design, failure analysis, and vibration.
 {¶ 29} Because Bigler's van and locking system were unavailable, neither Dr. Wiechel nor any other expert was able to inspect or test the system. Dr. Wiechel visited the scene of the accident and also reviewed the available materials, including the police report, photos, and various depositions. Dr. Wiechel concluded that only three possibilities existed: (1) there was a "false lock"; (2) Bigler was never locked in to begin with; and (3) Bigler lost control of the van on his own. Based on observation of photos that showed wear on the locking mechanism, Dr. Wiechel's theory about the false lock was that the bolt head on the bottom of the wheelchair rode up over the top of the EZ Lock, causing a corner of the pin to reach down and push on the latching mechanism. This would have allowed the jaws of the locking mechanism to close without the bolt actually being engaged in the lock. Since the jaws were closed, the alarm would not have been triggered.
 {¶ 30} Initially, Dr. Wiechel based his reconstruction of how the bolt had ridden *Page 12 
over the top on what was called the "worn bolt theory." To test this theory, Dr. Wiechel used four grade two bolts, which were softer than the bolt used by EZ Lock. A machinist ground down the bolts in various ways and also ground down the locking device to approximate what was shown in the photos of the actual device. Dr. Wiechel was able to get his theory to work in this manner. However, he later discarded this theory due to a lack of evidence that the actual bolt was worn at all comparably to the four bolts. In fact, the only evidence was that the bolt was not eroded or worn.
 {¶ 31} Dr. Wiechel later testified about an "angled bolt theory," in which the bolt would ride over the top of the device if it entered the locking mechanism at an angle, either to the right or left, or forward. Dr. Wiechel demonstrated this theory during his deposition, but he was able to get it to work only if the bolt was tipped at a 45 degree angle. Dr. Wiechel had previously indicated that for his theory to work, the bolt had to be angled at least thirty degrees. Dr. Wiechel theorized that the bolt could be turned at such an angle if a bracket were bent or the bolt were loose. However, no physical evidence existed to support the contention that the bolt entered at such an angle. In fact, the inspection of the bolt shortly after the accident indicated that it was secure, was at the perfect height to engage the lock, was not worn or eroded, and worked excellently.
 {¶ 32} Concerning the stabilizer bar, Dr. Wiechel testified that if Bigler rode over the locking mechanism rather than engaging, it would have raised up the bracket on the wheelchair and it would not have fit into the stabilizer bar. This would have alerted Bigler to the fact that he was not engaged properly. Dr. Wiechel stated alternatively that if Bigler had been able to engage his chair in the stabilizer bar, he would not have *Page 13 
been able to tip backwards and roll into the back of the van. Instead, there would have been enough friction to prevent Bigler from sliding back.
 {¶ 33} After taking Dr. Wiechel's deposition, EZ Lock filed a motion in June 2007, asking the trial court to exclude Dr. Wiechel's testimony, based on insufficient reliability under Evid. R. 702 and Daubert v. DowPharmaceuticals (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Key Mobility joined in the motion, and both defendants also filed motions for summary judgment. Subsequently, Dr. Wiechel offered further opinions during another deposition that was taken in September 2007. Approximately one week later, the trial court held a Daubert hearing, which lasted nearly a full day and included both direct and cross-examination of Dr. Wiechel. Following the hearing, the trial court issued a decision sustaining the motions to exclude Dr. Wiechel's testimony.
 {¶ 34} The court concluded that the "worn bolt theory" was not based on reliable, scientific, technical or other specialized information because Dr. Wiechel had conceded at the hearing that it was not testable. The court further concluded that Dr. Wiechel's testimony about the "angled bolt theory" was unreliable because it had not been reliably implemented in the procedures or tests Dr. Wiechel performed, nor was the testing conducted in a way that yielded an accurate result.
 {¶ 35} In addition, the trial court noted that Dr. Wiechel had not tested his theory that a stabilizer bar would have prevented the accident. And finally, the court held that exclusion of Dr. Wiechel's testimony was an appropriate sanction for the plaintiffs' spoliation of the subject device. The court did not discuss any specifics of the spoliation conclusion and simply referred generically to the intent, level of prejudice and reasonableness of the plaintiffs' actions. *Page 14 
 {¶ 36} Subsequently, the trial court filed a decision rendering summary judgment in favor of EZ Lock and Key Mobility. The court noted that the claims of the Asburys and Taylor were supported by Dr. Wiechel's testimony, which had been found unreliable underDaubert and Evid. R. 702. The court indicated that it would strike Dr. Wiechel's affidavit for the reasons expressed in its Daubert decision. The court also noted that there was no evidence that a stabilizer bar was required or should have been installed on the type of wheelchair involved, and that no testing had been performed on the issue. The court then found an absence of genuine issues of material fact on the claims for design defect and failure to warn.
 {¶ 37} The Asburys and Taylor appeal from the summary judgment rendered in favor of EZ Lock and Key Mobility.
 II {¶ 38} Because the Asburys and Taylor have combined their discussion of the assignments of error, we will do the same. The Asburys and Taylor's First Assignment of Error is as follows:
 {¶ 39} "THE TRIAL COURT ERRED IN GRANTING THE MOTION OF APPELLEE EZ LOCK INCORPORATED (`EZ LOCK) TO EXCLUDE THE TESTIMONY OF APPELLANT'S EXPERT WITNESS, JOHN WIECHEL, PH.D., P.E., (`DR. WIECHEL') FOR INSUFFICIENT RELIABILITY, AS DR. WIECHEL'S EXPERT TESTIMONY POSSESSES AMPLE RELIABILITY UNDER EVID. R. 702, DAUBERT V. MERRILL DOWPHARMACEUTICALS (1993), 509 U.S. 579, and MILLER V. BIKE ATHLETICCO. (1998), 80 Ohio St.3d 607, 611-12." *Page 15 
 {¶ 40} The Asburys and Taylor's Second Assignment of Error is as follows:
 {¶ 41} "GIVEN THAT DR. WIECHEL'S TESTIMONY POSSESSES AMPLE RELIABILITY FOR SUBMISSION OF HIS OFFERED EXPERT OPINIONS AT TRIAL, THE TRIAL COURT ERRED IN GRANTING THE MOTIONS FOR SUMMARY JUDGMENT OF EZ LOCK AND KEY MOBILITY SERVICES, LTD. (`KEY MOBILITY') BASED ON A FINDING THAT DR. WIECHEL'S TESTIMONY DID NOT MEET THE REQUISITE STANDARD FOR RELIABILITY OF EVID. R. 702, DAUBERT, SUPRA, AND MILLER, SUPRA."
 {¶ 42} Under these assignments of error, the Asburys and Taylor contend that all the factors for admissibility of Dr. Wiechel's testimony under Daubert and Evid. R. 702(C) have been satisfied. They contend that Dr. Wiechel is well-qualified to testify based on his training and experience as a professional engineer. In addition, the Asburys and Taylor contend that Dr. Wiechel's methodology has been tested and is testable, has been subjected to ample peer review, enjoys a low rate of error, and has garnered general acceptance within the scientific community.
 {¶ 43} "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." Smith v. FiveRivers MetroParks (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." GNFH, Inc. v. W. Am. Ins. Co.,172 Ohio App.3d 127, 133, 2007-Ohio-2722, *Page 16 873 N.E.2d 345, at ¶ 16.
 {¶ 44} As was noted, the claims against EZ Lock were based on strict liability for the defective design and distribution of the EZ lock system, negligent design and distribution of the system, defective design under R.C. 2307.75, failure to warn under R.C. 2307.76, and common law negligence. The claims against Key Mobility were based on supplier or distributor liability under R.C. 2307.78, strict liability for distribution and installation, and negligent distribution and installation. We will briefly outline the legal requirements for each cause of action.
 A. Legal Causes of Action against EZ Lock Common law claims for Strict Liability for Defective Design and Distribution of the EZ Lock System and for Negligent Design and Distribution of the EZ Lock System {¶ 45} In Routzahn v. Garrison, Montgomery App. No. 21190,2006-Ohio-3652, we noted that the General Assembly had eliminated common-law product liability causes of action in S.B. 80, effective April 7, 2005. However, we also noted that common-law actions for negligent design are still allowed for causes of action that arose prior to the amendment. Id. at ¶ 61. Accordingly, since both the cause of action in this case and the filing date of the present action pre-dated S.B. 80, the Asburys and Taylor may raise both common-law negligent design and statutory product-liability claims.
 {¶ 46} We stated in Routzahn that under the common law:
 {¶ 47} "[A] product is defective in design `if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or *Page 17 
if the benefits of the challenged design do not outweigh the risk inherent in such design.' * * * Moreover, a product may be defective in design if the manufacturer fails to incorporate feasible safety features to prevent foreseeable injuries." 2006-Ohio-3652, at ¶ 62 (citation omitted).
 {¶ 48} In products-liability cases involving defects, the plaintiff has the burden of proving by a preponderance of the evidence that:
 {¶ 49} "`(1) there was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendants; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss.'"State Farm Fire Cas. Co. v. Chrysler Corp. (1988), 37 Ohio St.3d 1,5-6, 523 N.E.2d 489 (citations omitted). Thus, in order to survive summary judgment on the common law product liability claims, the Asburys and Taylor will need to establish genuine issues of material fact regarding whether a defect existed and proximately caused their injuries.
 2. Defective Design under R.C. 2307.75 {¶ 50} Under the statutory cause of action for products liability provided by R.C. 2307.73, manufacturers are liable for compensatory damages based on product-liability claims only where a claimant establishes all the following elements by a preponderance of the evidence:
 {¶ 51} "(1)* * * the manufacturer's product in question was defective in manufacture or construction as described in section 2307.74 of the Revised Code, was defective in design or formulation as described in section 2307.75 of the Revised Code, *Page 18 
was defective due to inadequate warning or instruction as described in section 2307.76 of the Revised Code, or was defective because it did not conform to a representation made by its manufacturer as described in section 2307.77 of the Revised Code;
 {¶ 52} "(2) A defective aspect of the manufacturer's product in question as described in division (A)(1) of this section was a proximate cause of harm for which the claimant seeks to recover compensatory damages;
 {¶ 53} "(3) The manufacturer designed, formulated, produced, constructed, created, assembled, or rebuilt the actual product that was the cause of harm for which the claimant seeks to recover compensatory damages."
 {¶ 54} Subsection (B) of R.C. 2307.73 further states that:
 {¶ 55} "If a claimant is unable because the manufacturer's product in question was destroyed to establish by direct evidence that the manufacturer's product in question was defective or if a claimant otherwise is unable to establish by direct evidence that the manufacturer's product in question was defective, then, consistent with the Rules of Evidence, it shall be sufficient for the claimant to present circumstantial or other competent evidence that establishes, by a preponderance of the evidence, that the manufacturer's product in question was defective in any one of the four respects specified in division (A)(1) of this section."
 {¶ 56} The applicable prong under consideration at this point is defectiveness in design under R.C. 2307.75. This statute provides in pertinent part that:
 {¶ 57} "(A) Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to *Page 19 
division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section."
 3. Failure to Warn under R.C. 2307.76 {¶ 58} As was noted, in addition to a design defect under R.C.2307.75, a statutory products-liability claim may be asserted under R.C.2307.76 for "failure to warn." This statute provides that:
 {¶ 59} "(A) Subject to divisions (B) and (C) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:
 {¶ 60} "(1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:
 {¶ 61} "(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 62} "(b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.
 {¶ 63} "(2) It is defective due to inadequate post-marketing warning or instruction if, at a relevant time after it left the control of its manufacturer, both of the following applied:
 {¶ 64} "(a) The manufacturer knew or, in the exercise of reasonable care, should *Page 20 
have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 65} "(b) The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm."
 4. Common Law Negligence {¶ 66} The Asburys and Taylor also included a generic common-law claim for negligence. In general, to establish a claim for negligence under the common law, "one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." Menifee v. OhioWelding Products, Inc. (1984), 15 Ohio St.3d 75, 77, 472 N.E.2d 707,710. Furthermore, "[t]o recover under a failure-to-warn theory at common law, the plaintiff must prove that the manufacturer knew or should have known, in the exercise of reasonable care, of the risk or hazard about which it failed to warn and that the manufacturer failed to take precautions that a reasonable person would take in presenting the product to the public." Cincinnati v. Beretta U.S.A. Corp.,95 Ohio St.3d 416, 425, 2002-Ohio-2480, 768 N.E.2d 1136, at ¶ 33.
 B. Legal Causes of Action against Key Mobility 1. Negligent Distribution and Installation {¶ 67} The Asburys and Taylor have raised common law negligence claims against Key Mobility, the company that distributed and installed the system. In this *Page 21 
regard, the Asburys and Taylor claim that Key Mobility negligently distributed or installed the locking system. In such situations, the law requires a showing that a duty existed, that Key Mobility breached the duty, and that the breach proximately caused injury to the Asburys and to Taylor. Menifee, 15 Ohio St.3d at 77.
 2. Supplier or Distributor liability under R.C. 2307.78 {¶ 68} R.C. 2307.78(A) provides a statutory cause of action against suppliers by stating that:
 {¶ 69} "[A] supplier is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, that either of the following applies:
 {¶ 70} "(1) The supplier in question was negligent and that, negligence was a proximate cause of harm for which the claimant seeks to recover compensatory damages;
 {¶ 71} "(2) The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages. A supplier is subject to liability for such a representation and the failure to conform to it even though the supplier did not act fraudulently, recklessly, or negligently in making the representation."
 3. Strict Liability for Distribution and Installation {¶ 72} Under R.C. 2307.78(B), suppliers may be liable for products-liability claims *Page 22 
as if they were manufacturers of a product, if the requirements in subsection (B) are met. These requirements include such matters as the fact that the manufacturer of the product is not subject to service in Ohio, and that the supplier in question is owned in whole or in part by the manufacturer. There was no indication in the present case that any of the requirements in R.C. 2307.78(B)(1)-(8) apply. If the requirements had applied, Key Mobility could be liable for the products liability claims as if it had been the manufacturer.
 C. All Theories Require a Causal Link {¶ 73} A common denominator of all these theories is a causal link between the alleged defect or negligent action and the injury caused. Unlike situations where the causal link is obvious, mechanical devices are complicated and "the realm for jury speculation is much wider."Hickey v. Otis Elevator Co., 163 Ohio App.3d 765, 771, 2005-Ohio-4279,840 N.E.2d 637, at ¶ 18. In such situations, "the possible causes for injuries * * * are far too numerous to send the issue to a trier of fact absent evidence that would support nonspeculative jury finding that the challenged design defect caused the injuries." Id.
 {¶ 74} In their motions for summary judgment, EZ Lock and Key Mobility contended that the Asburys and Taylor could not demonstrate a prima-facie case of products liability or negligence under any theory of liability. EZ Lock and Mobility pointed out that the lock device and alarm were tested and were found to be in working order after the accident. They also noted that the only "evidence" the plaintiffs' expert had to support his theories was the fact that the accident happened. However, there *Page 23 
were numerous other potential causes for the accident, including the possibility that Bigler simply lost control of the van, or that he failed to properly engage himself in the locking device.
 {¶ 75} EZ Lock and Key Mobility satisfied their initial burden of specifically pointing to "evidence of the type listed in Civ. R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." Dresher v. Burt,75 Ohio St.3d 280, 293, 1996-Ohio-107, 662 N.E.2d 264. Consequently, the Asburys and Taylor had a reciprocal burden "to set forth specific facts showing that there is a genuine issue for trial." Id. They attempted to meet this burden with Dr. Wiechel's expert testimony and opinions, which would be the type of evidence needed to establish a causal link where numerous possible causes exist. However, the trial court rejected Dr. Wiechel's testimony, based on its prior ruling that the testimony was not reliable under Evid. R. 702(C) and Daubert. Accordingly, the critical question is whether the trial court properly excluded Dr. Wiechel's testimony.
 D. Exclusion of Testimony under Evid. R. 702 andDaubert {¶ 76} As a general rule, Evid. R. 702 provides that witnesses may testify as experts if all the following apply:
 {¶ 77} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 78} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; *Page 24 
 {¶ 79} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 80} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 81} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 82} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 83} The United States Supreme Court concluded in Daubert that trial judges have a responsibility under Fed.R. Evid 702 to ensure that scientific testimony is not only relevant but reliable. Daubert (1993),509 U.S. 579, 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469. In 1998, the Ohio Supreme Court adopted this role for Ohio state court trial judges as well. See Miller v. Bike Athletic Co., 80 Ohio St.3d 607, 616,1998-Ohio-178, 687 N.E.2d 735, and Terry v. Caputo, 115 Ohio St.3d 351,356-357, 2007-Ohio-5023, 875 N.E.2d 72.
 {¶ 84} The Ohio Supreme Court has described the trial court's role as a "gatekeeping function" that "imposes an obligation upon a trial court to assess both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify." 2007-Ohio-5023, at ¶ 24. After a trial judge has ruled on admissibility, the decision is reviewed for abuse of discretion.Miller, 80 Ohio St.3d at 616. However, even though the trial court's discretion is not totally unlimited, appellate *Page 25 
courts cannot substitute their judgment for that of the trial court.Valentine v. Conrad, 110 Ohio St.3d 42, 43, 2006-Ohio-3561,850 N.E.2d 683, at ¶ 9.
 {¶ 85} In Terry, the Ohio Supreme Court noted that:
 {¶ 86} "The test for reliability requires an assessment of the validity of the expert's methodology, by applying with flexibility several factors set forth in Daubert. * * * The trial court should first assess whether the method or theory relied upon has been tested. * * * Next, it should consider whether the theory has been the subject of peer review, and then whether the method has a known or potential error rate. . . . . Finally, Daubert instructs trial courts to look at whether the theory has gained general acceptance in the scientific community. . . . . None of these factors, of course, is dispositive of the inquiry, and when gauging the reliability of a given expert's testimony, trial courts should focus `solely on principles and methodology, not on the conclusions' generated." 2007-Ohio-5023, at ¶ 25 (citations omitted).
 {¶ 87} The trial court's responsibility does not end with reliability, however. Instead, the gate-keeping function requires courts to judge whether expert testimony is "`"relevant to the task at hand" in that it logically advances a material aspect of the proposing party's case.'". . . . "This aspect, which courts have colloquially labeled `fit,' requires a `"connection between the scientific research or test result * * * and particular disputed factual issues in the case."'" Id. at ¶ 26 (citations omitted). In Terry, the Ohio Supreme Court also noted that:
 {¶ 88} "Reliability and relevance are not mutually exclusive findings, and they may overlap in some instances. As one federal court stated, `[A] determination regarding the scientific validity of a particular theory requires not only an examination of *Page 26 
the trustworthiness of the tested principles on which the expert opinion rests, but also an analysis of the reliability of an expert's application of the tested principals [sic] to the particular set of facts at issue.'" Id.
 {¶ 89} In the present case, the trial court placed primary emphasis on the "test" factor when it evaluated Dr. Wiechel's testimony. The trial court noted Dr. Wiechel's concession that the "worn bolt theory" was not testable. The court then concluded that the "angled bolt theory" was not reliably implemented in the procedure or experiment Dr. Wiechel performed. And finally, the court found that Dr. Wiechel had not tested the theory that a stabilizer bar would have prevented the accident.
 {¶ 90} Based upon our review of the record, we agree with the trial court. As a preliminary point, we note that Dr. Wiechel's credentials as an expert are not in question. Nonetheless, Dr. Wiechel's testimony did not comply with Evid. R. 702(C), because his theories were not objectively verifiable and the tests, to the extent any tests were performed, did not reliably implement his theories and were not conducted in a way that would yield an accurate result.
 {¶ 91} At the Daubert hearing, Dr. Wiechel admitted that the four bolts he had used for testing were inconsistent with the only evidence, which indicated that the bolt was not eroded or worn. Consequently, Dr. Wiechel discarded this theory in the context of the four bolts he had tested — and these were the only tests that were done to support the "worn bolt theory."
 {¶ 92} Dr. Wiechel also stated during the Daubert hearing that the "angled bolt theory" could work if a bolt were angled at 30 degrees. For purposes of considering this point, we will disregard the fact that the theory did not work in practice unless the bolt *Page 27 
was angled at 45 degrees. We will also disregard the fact that there was no evidence that the bolt was angled in any fashion at the time of the accident.
 {¶ 93} Dr. Wiechel theorized that the bolt could be angled sufficiently if the bracket under the wheelchair had a permanent bend in it, if the bolt were loose, or if the bolt itself were bent. However, Dr. Wiechel had no idea if any of these matters occurred before the accident. Dr. Wiechel conceded at the hearing that despite having a test apparatus and all the work he had done to date, he had not been able to test and prove the "angled bolt theory."
 {¶ 94} Dr. Wiechel also admitted that he had not done anything to test his criticism of the presence or absence of a stabilizer bar. Notably, prior to the hearing, Dr. Wiechel had in his possession at least five samples of EZ lock bases, an exemplar van (a 1990 Ford Econoline 150), an exemplar wheelchair, and a stabilizer bar and bracket. Despite having the necessary materials, Dr. Wiechel did not test to see what would happen to the chair when any kind of force was applied, nor did he test to ascertain the amount of friction that would be created between the tongue and stabilizer bar if the chair tipped up. He did not test the amount of acceleration necessary to cause the wheelchair to tip, although such a test could be done.
 {¶ 95} In short, the only "evidence" supporting the theory that Bigler's wheelchair became detached from the locking mechanism was Bigler's own testimony. However, Bigler's testimony was not substantiated by either the physical evidence or by Dr. Wiechel's tests, to the extent any testing was done. Accordingly, the trial court did not abuse its discretion in excluding Dr. Wiechel's testimony.
 {¶ 96} In the absence of expert testimony, there was no evidence to causally *Page 28 
connect any actions or inactions of EZ Lock or Key Mobility to the injuries that occurred. Although R.C. 2307.73(B) allows claimants to present circumstantial or other competent evidence to establish a defect where the manufacturer's product has been destroyed, there was no competent evidence in this case to causally link any alleged defect with the injuries that were sustained. The trial court, therefore, did not err in rendering summary judgment in favor of EZ Lock and Key Mobility.
 {¶ 97} The Asburys and Taylors' First and Second Assignments of Error are overruled.
 III {¶ 98} As a final matter, we note that EZ Lock and Key Mobility have filed motions to strike portions of the reply brief filed by the Asburys and Taylor, or alternatively, for permission to file a sur-reply. EZ Lock has also filed a motion to dismiss the appeal as moot. These motions are based on the fact that the Asburys and Taylor failed to assert a separate assignment of error with regard to the trial court's ruling on spoliation of evidence. Consequently, EZ Lock and Key Mobility contend that the Asburys and Taylor are precluded from challenging the exclusion of Dr. Wiechel's testimony under the spoilation doctrine. Because spoliation provides a separate basis for affirming the trial court judgment, EZ Lock and Key Mobility contend that the Asburys and Taylor cannot prevail on appeal even if the trial court ruled incorrectly under Daubert.
 {¶ 99} In view of our disposition of the First and Second Assignments of Error, the motion to dismiss and motions to strike are overruled as moot. *Page 29 
 IV {¶ 100} The Asburys and Taylor's First and Second Assignments of Error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and WALTERS, J., concur.
(Hon. Sumner E. Walters, retired from the Third Appellate District, (sitting by assignment of the Chief Justice of the Supreme Court of Ohio)
Copies mailed to:
Frank A. Ray
Janica A. Pierce
Lee C. Falke
Edward J. Dowd
Dawn Frick Nicholas E. Subashi
Anne P. Keeton
Hon. Gregory F. Singer
[1] In July 2007, plaintiffs voluntarily dismissed claims brought against EZ Lock on the basis of res ipsa loquitur, R.C. 2307.77, and breach of implied warranty, as well as claims alleging that Key Mobility was strictly liable for distribution and installation of the system (the Third, Sixth, Ninth, and Tenth Causes of Action). Although the plaintiffs did not dismiss the res ipsa loquitur claim against Key Mobility (the Twelfth Cause of Action), res ipsa loquitur has not been mentioned on appeal. In addition, plaintiffs did dismiss a similar claim against EZ Lock. Accordingly, we conclude that this theory of recovery has been abandoned and we will not consider it further. *Page 1